Ms. Ramos, good morning. Good morning, Your Honor. May I please record my name is Lidia Ramos, and I represent Michelle Vasarhelyi Atlan in this case. As the court knows, this case stems from a simple set of facts. A simple set of facts? Okay. My client was moving from Chicago to Puerto Rico, and she asked Mr. Rojas to take care of the shipment of her belongings from Chicago all the way to Puerto Rico. When things arrived in Puerto Rico, Mr. Rojas, who lived in Puerto Rico, was supposed to receive those sealed shipments and to place everything in storages that he was going to rent for her and in an apartment that was leased for her to live in when she moved to Puerto Rico. In this moving process, there has been a lot of things, very valuable artwork and antiques that are not now vanished. How do we know what was in that van to begin with? Because Ms. Vasarhelyi had photographic inventory that was part of the exhibits that we filed in the appendix with all the things in the process of packing. Also, Ms. Vasarhelyi had the Monaghan inventory that the Chicago court did when it seized all the artwork that it was in the court in Chicago, and then it got released. And that's a court-formed inventory of all the artwork that she had and what seized in that litigation. When all that got released, all that same inventory was going to travel to Puerto Rico. But then also, that inventory was in charge of Mr. Rojas because the court established, and Ms. Vasarhelyi and everybody justified, she was at home taking care of the things that were packed at home. Mr. Rojas was in charge of the things in the lockers, of the artwork in the lockers. So there was an inventory, but if there was any failure to make an inventory, it was Mr. Rojas who was physically present in those lockers when that artwork was being... The district court specifically found, and I'm referring to addendum page 38, that Vasarhelii, am I pronouncing that right? Vasarhelii, uh-huh. Yes, did not write down an inventory of the items shipped. Yes, we didn't know why there's that conclusion because if you look at page 339 of the appendix, there's a photographic inventory of the things that she packed in her apartment, and that's the part that she took care of during the court session in the opinion. That's what she oversaw. And then if you look at page 640 of the appendix, there's a whole court-formed inventory. But then... Is there a bill of lading? The bill of ladings were prepared by Mr. Rojas, and the court criticized that it's too general. But Ms. Vasarhelii was not there. It was Mr. Rojas who was with the shippers in the lockers to make sure that everything exited and was shipped to Puerto Rico. So I think you're saying this doesn't sound like an issue of law. It sounds like you're saying the district court just flatly erred without any support at all in the record when it said that she didn't write down an inventory of the items shipped. Well, that is definitely a mistake. I mean, the inventories are... A mistake by whom? I'm sorry? A mistake by whom? I think the district court did not see the evidence because it's there, page 339 and 640. There's a written inventory of hard work and there's a photographic inventory of items, antiques, being shipped to Puerto Rico. So it does exist. But other than that... Excuse me, I thought, counsel, that the problem was that although you have those photographs, those aren't photographs of anything in the shipping containers. They're not taken in situ. Her testimony, as I understood it, was that I think that these things were in the shipping container and the district court said, given her shaky testimony, the lack of any written inventory, her uncertainty about what was in the containers, and the fact that she had the burden of proof, she hasn't proved it.  Well, I didn't think that there was a finding by the court that she had a shaky recollection of... Well, didn't she testify, I think these things were there, rather than say... She never came in and said, here's a list of what was in the shipping containers. There is no requirement for her to... I understand that. But she does have the burden of proving what was in the containers. And everything that she packed, her stuff in her house that she packed, she took the pictures. And everything that was already in storages was inventory. And the problem is that in that process, there we can divide in three sections what happened. I'm looking at page 49 of the transcript of her cross-examination, in which the question is, beside the information provided there referring to descriptions, was any inventory made of what was contained in those 512 pieces? And the answer, no. And the question, in addition to the description providing the packing list, was an inventory performed? On my part, I don't think so. So why couldn't the district court say that what we've got here is her saying what stuff she had, her having some pictures, her having some lists of what she had, but she had no sort of controlling inventory of what was actually in the containers. Because she answered that she personally didn't make it, but we have a court one, and that was used. I mean, the court in Chicago did release that Monaghan inventory, and that's exactly what was released to be sent to Puerto Rico. Excuse me. Is the court inventory of the materials that were inside the container? The court inventory was of everything that was trapped in the Monaghan case that was later released. Okay. My question is, is the court inventory an inventory of what went into the container? Well, technically it is. Well, why technically? Everything that was released that she had in Chicago traveled to Puerto Rico. This is a permanent move to Puerto Rico. Nothing was going to be left over in Chicago. I mean, even the fact that some storages in Chicago were left full was part of the issue. I mean, why were there any leftover storages left over there? I don't know that we have to speculate as to that. But the only thing we have to know is what was inside the container. And I still don't understand how a court inventory as to what was going to be released proves or provides evidence as to what went into the container. Well, Your Honor, I believe that everything that she had had to come to Puerto Rico. Supposing that there was an inventory that needed to be done in order to control what came in and what got released in Puerto Rico, the only thing we could reasonably ask from Vasarely and from Rojas is that each of them had what they took care of. Now, Mr. Rojas took care of everything that had to do with the paintings. Ms. Vasarely took care of the packing in her apartment and her antiques. So even assuming that there was a necessity to have an inventory of artwork, it was not her duty to do it. I mean, the court did establish that he was in charge of everything having to do with the shipment, except for the stuff that she did at home. At home was the antiques. She couldn't have inventoried something that he packed and that he put in the shipment. Well, suppose that's right. Okay, there was no way she could do the inventory. And then he didn't do an inventory. So there's no inventory of exactly what was in the containers, which turns it into a factual issue for the court as to who to believe in what went into the containers. And she's saying, well, I had all this stuff to begin with, and I intended to ship it all, so it all must have got in there, and the court could have believed that. But the court also could have believed, I don't think anyone tampered with this, so it didn't get in there. It sounds like we're now hearing a trial all over again here. Well, I believe that the trial judge did not have any kind of questions, that everything was supposed to be shipped to Puerto Rico. There was nothing supposed to be left over. So everything must have gotten there. The containers arrived to Puerto Rico, and the seals were sealed. They were not tampered with. Everything must have gotten there. If they are not there, then they disappeared. Either they are in Chicago, or they went to Hong Kong, or they went somewhere else, but they don't walk. They have to be somewhere. Now, there is one shipment in particular that it traveled without a name to New Jersey, and there was no assignment, no request from my client to send anything to New Jersey. Just like that container traveled to New Jersey, there could be one in Hong Kong under God knows whose name. But we can't know, because part of the duty that Mr. Rojas had toward Ms. Vasarely was giving her the shipment documents. If he doesn't give them to her, how can she know where they traveled, under whose name? And the court saw in this case that those shipments traveled under incorrect spellings of Mr. Luis Rojas. There was one that traveled even without a name, and there were others that traveled not to Puerto Rico. And that was his responsibility. He had to ensure they got to Puerto Rico. Even so, when things got to Puerto Rico, there's three kinds of things that got here. There's some stuff that got here, and he says, yes, it got here. He admits. He just says, I removed it because I was entitled to it. I had the right because they were my father's. There's another part of things. He says, yes, I had it. It disappeared because I didn't have it anymore. And there's some, he says, I don't know. I don't know even if it made it here. As to the things that did get here specifically, there's the artwork that he says now that it belongs to his father. That artwork, it's unconstituted. It's here. And he said, I removed it because I believe it's my father's. But if you look at the complaint document, appendix page 446, there's two artworks. They're listed that he says in the initial complaint belong to Mrs. Ray. In the middle of trial, now they suddenly belong to his father. So we go to the court's analysis, and the court says, well, we believe that that artwork is actually Dr. Rojas' artwork because that agreement in 2010 superseded the 2009 agreement. But if you look at the 2010 agreement, it specifically says, whereas Dr. Rojas is the owner of some artwork, whereas that artwork is in litigation in Chicago. Therefore, Dr. Rojas can go, appear in that case to try to remove that artwork. That's exactly what my client said. That was the purpose. Did that ever happen? No. Did that intervention ever happen? I mean, he said it in the trial. They didn't intervene in that case. Did the Chicago agreement clearly state that Dr. Rojas was the owner of those paintings? Yes, and he's a surrogate. Excuse me. What does that mean in terms of the argument you just made? I'm saying that that's a simulated contract. Isn't that a question of fact? The district court heard that argument and rejected it. The district court said, no, that's not so. This is a real contract. Okay, so assuming it is a real contract, then the court had to fully analyze the contract because the contract does say that he's the owner, but that he will keep and guarantee other artwork of similar value that he's going to keep until she returns to him his artwork. Was there a claim in this case for breach of that contract? It was a retell free planning. But it wasn't for breach of that contract? No. Okay. And then the court goes halfway because it says she has to return it to Dr. Rojas. But we never see the analysis of has Dr. Rojas returned to her the artwork in guarantee that he was keeping while he got back his original artwork. So even if the court decided correctly in saying this is Dr. Rojas' artwork, it went halfway because it did not finish looking at the clause that said, well, but he's got to return to her the work that is in guarantee. And I believe that at least the court, if it was going to rule that the owner is Dr. Rojas, then it has to go fully into the contract or at least require that he returns what he kept in consignment so that then she can return to him, okay, the things that she kept. The other thing is that there's some artwork that the court did not mention, but Mr. Rojas did say he has it. And if you look at pages 404 of the appendix, 432, 431, and 433, all those artworks, there's no controversy. They were in Puerto Rico. Mr. Rojas says, I have here this artwork with me. Where is it? Missing. Disappeared. Article 1137. Did you bring that up with the district court? I'm sorry? Did you bring that up with Judge Pisoza? Yes. And what was the response? There was no mention about it in the opinion and order. But when you got the opinion, did you say, hey, I think you missed something? I think in the motion for reconsideration, we brought it up, but I'm not 100% sure of that. I do remember that these exhibits were brought up to the court's attention because it's an inventory that Mr. Rojas had in his house. And there was another one that he said, this artwork is here in Puerto Rico. And there's another one that it was testified, yes, this artwork was here, and it was to be taken to be stretched. And then there was another one that a witness saw, yes, they were there in his house. Now, he says, I don't have it. Well, she doesn't have it in there. Article 1137, when things get lost under a person's care. You better round up in about one minute. Yeah, there's a presumption that they got lost with fault, and that's a standard that should be applied here. Thank you. Thank you. Mr. Carrillo, good morning. Good morning, Your Honors. May it please the Court. We think that this case, after 19 days of trial, hundreds of exhibits, nine witnesses, went over all these issues that Sister Counsel is bringing before the Court today. And based on that, we think that the standard of review that should be used should be the one stated in Rule 52A of the Federal Rules of Civil Procedure that is a clearly erroneous test, okay? And we don't think that Judge Bezosa heard in a way that could be considered as clearly erroneous way. As Sister Counsel was vehemently explaining, all these issues were brought before Judge Bezosa, and he had an opportunity over these 19 days and, you know, all the evidence that was submitted to entertain the questions that are being brought before the Court today. And his decision was one that I believe was balanced. You know, in some parts it was favorable to Mr. Bruno Vasarely, and in some parts it was favorable to my clients. And I believe that that balance should be taken in consideration in making the analysis on whether he committed a clear error in making these determinations. If we go one by one, the depositum and agency agreements were things that he applied the law, the civil code, the agency parts of it, to what he found during the testimony. And he found that, in fact, there was a depositum and an agency agreement between the parties, but he found out that the only breach was that Mr. Rojas had to put the shipping containers on his name rather than on Mr. Bruno Vasarely's name, and that the storage was also put on his name. That was the only finding that Judge Bezosa made as to the breach of the depositum and agency agreements. And there was a justification for that. Even though he found a breach, there was a justification. Mr. Rojas specifically said during trial that he tried to comply with Mr. Bruno Vasarely's request, but he couldn't do it. The shippers would request that it would be on the name of whoever was going to receive it in Puerto Rico, and that he tried to do the storage on the name of her corporations, but she didn't have all the paperwork ready, so he had to end up putting them on his name. So regardless of whether there was a breach or not, it was something that he considered, and he found that nothing had to be done regarding that. And with that exception, he said, let's go ahead and move to other items. The biggest one being the repletting that was asked for by Mr. Bruno Vasarely. And the problem with the repletting is that it is very well regulated in Puerto Rico under the civil code, and it had a very strict standard that had to be met. She didn't meet the standard for that. And one of the issues in particular was what the jurors were questioning before regarding inventories. You know, sister counsel talks about inventories that Mr. Rojas admitted that Mr. Rojas did this or that, but the point is that the one putting things in the containers in Chicago was Mr. Bruno Vasarely, and she was the one that could have stated or in writing or do something regarding what went into each particular container. She didn't do it. And that is the reason why Judge Bezosa says without an inventory, there is no way of finding out that something was missing at the end of that trip. We don't think that that is clearly erroneous. If it is erroneous at all, I think that it is a perfectly valid conclusion, and it should be affirmed. As to the other causes of action, the sale of the apartment in Chicago, the adjustment of the P.O. amount, and the computation of damages, I believe that Judge Bezosa made a very good analysis of the factual situation he had before him, and he applied the law in a manner that was not erroneous in any way, at least in these particular items that are being brought in the appeal before this court. So there was no way of making a determination that there was damages in the sale of the apartment in Chicago, because the claim that Mr. Bruno Vasarely was making was that he sold it below the market price. But there was no appraisals being submitted in evidence, no expert witness testimony, nothing. It was simply the fact that before, an offer had been made in a larger amount and she had not authorized it. There was no evidence of any damage whatsoever. As to the computation of the damages, I think that the quotes made by Judge Bezosa in the decision is exactly what the law in Puerto Rico requires, when you are making an assessment of damages of this kind. In our perspective, no damages should have been awarded, but they were in the amount of $5,000. That is his finding. We think that altogether the appeal does not meet the standard for proving that there were clearly erroneous decisions on the trial court. As such, the judgment should be affirmed. Thank you, Carl.